**LA SALLE NATIONAL BANK, Plaintiff,**

v.

**ARTHUR ANDERSEN & CO., et al., Defendants.**

**BANK OF CALIFORNIA, Plaintiff,**

v.

**ARTHUR ANDERSEN & CO., et al., Defendants.**

**The FIRST PACIFIC BANK OF CHICAGO, Plaintiff,**

v.

**ARTHUR ANDERSEN & CO., et al., Defendants.**

Nos. 80 C 1249, 80 C 1250 and 80 C 2104.

United States District Court, N. D. Illinois, E. D.

Feb. 5, 1982.

James Spiotto, Ann Acker and Frederick V. Lochbihler, Chapman & Cutler, Chicago, Ill., for LaSalle Bank and Bank of California.

Richard O. Briggs Baker & McKenzie, Chicago, Ill., for First Pac. Bank of Chicago.

Charles W. Boand, Robt. F. Forrer, Quinton F. Seamans and Leonard S. Shifflett, Wilson & McIlvaine, Chicago, Ill., for Arthur Anderson & Co.

John E. McCullough, Peterson, Ross, Schloerb & Seidel, Chicago, Ill., for Coopers & Lybrand.

Susan Getzendanner, Stanley J. Parzen, Mayer, Brown & Platt, Chicago, Ill., for Alexander Grant & Co.

## ORDER

BUA, District Judge.

Before the court are defendants' motions to dismiss. The plaintiffs, two national banking associations and one Illinois banking corporation, have charged each of the three defendant accounting firms, Arthur Andersen & Co., Coopers & Lybrand, and Alexander Grant & Co., with violating sections 10(b) and 18 of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78r, and sections 12(2) and 17(a) of the Securities Act of 1933, 15 U.S.C. §§ 77*l*(2) and 77q(a).[1] Subject matter jurisdiction over Counts I–IV of the complaints is based on section 27 of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa, and section

---

[1] The complaints in the three cases are virtually identical with the exception of the name of the plaintiff as are the memoranda submitted by each party in each of the three cases. Therefore, the court will treat all motions to dismiss in this order. The court will, however, refer to the complaint filed in No. 80 C 1249 and the note, note agreement, the supplement and amendments thereto submitted in connection with that case as representing the complaints, notes and note agreements involved in Nos. 80 C 1250 and 80 C 2104.

22(a) of the Securities Act of 1933, 15 U.S.C. § 77v(a).

The court limited the initial briefing on the motions to dismiss to the question of subject matter jurisdiction. Each of the three defendants contends that no "security" as defined by the federal securities laws [2] was involved in the transaction giving rise to plaintiffs' claims.[3]

Each of the claims based on federal law arises from alleged misrepresentations made by the defendants in connection with the issuance of three promissory notes by American Reserve Corporation (ARC) to plaintiffs in the aggregate amount of $7,500,000.00.

According to the complaint ARC "is a holding company that, through various subsidiaries, was engaged in . . . the business of writing property, liability, and life insurance." Complaint ¶ 9.

"Beginning in late 1976, ARC sought to secure financing through an offer to sell to a limited number of institutional investors certain Promissory Notes in the aggregate principal amount of $7,500,000. . . . The net proceeds from this proposed sale were purportedly to be used to retire certain borrowings with a certain bank and [an ARC subsidiary] and to supplement ARC's working capital. Plaintiff was among those to whom the offering was made." Complaint ¶ 17.

Each of three banks approached by ARC were given ARC's annual report and Form 10–K's for the fiscal years ending December 31, 1974, 1975, and 1976. Defendants Andersen and Coopers acted as ARC's independent auditors for these years and allegedly were responsible for certain misrepresentations and omissions violative of the securities laws. Defendant Grant was ARC's auditor for fiscal 1977.

On September 8, 1977, in a face-to-face meeting with plaintiffs' representatives at ARC's offices in Chicago, representatives of the three defendants allegedly made further misrepresentations and omitted to state certain important facts concerning ARC's financial condition, reinsurance arrangements, and reserves. Allegedly in reliance on these statements, the plaintiffs purchased ARC's promissory notes on September 15, 1977. Complaint ¶¶ 22–23.

The promissory notes were not appended to the complaints. However, the plaintiffs did attach a copy of the notes and note agreements dated September 15, 1977 to their memoranda in opposition to the motions to dismiss.

The relevant allegations contained in the complaint are as follows:

1. The Promissory Note purchased by Plaintiff for investment, as described more fully below, constitutes a security for purposes of federal securities laws. [Complaint ¶ 3].

2. This action arises from the offer and sale by ARC of certain Promissory Notes in the aggregate principal amount of $7,500,000.00 to a limited number of institutional investors including Plaintiff. [Complaint ¶ 9].

3. Beginning in late 1976, ARC sought to secure financing through an offer to sell to a limited number of institutional investors certain Promissory Notes in the aggregate principal amount of $7,500,000.00 (hereinafter the "Offering"). The net proceeds from this proposed sale were purportedly to be used to retire certain borrowings with a certain bank and GRC [an ARC subsidiary] and to supplement ARC's working capital. Plaintiff was among those to whom the Offering was made. [Complaint ¶ 17].

**2.** The court notes at the outset that the definition of security contained in the 1934 Act is functionally equivalent to the definition contained in the 1933 Act. *Tcherepnin v. Knight,* 389 U.S. 332, 342, 88 S.Ct. 548, 556, 19 L.Ed.2d 564 (1967).

**3.** Count V of the complaint is founded solely on state law and subject matter jurisdiction is based on the doctrine of pendent jurisdiction. *United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

4. Plaintiff reviewed [ARC's financial statements and 10K Forms] in detail and materially relied upon them in making its decision in the summer of 1977 to invest in ARC through the Offering. [Complaint ¶ 18].

5. To allay Plaintiff's fears, and to induce and secure Plaintiff's participation in the Offering, representatives of ARC [and the defendants] personally met with representatives of Plaintiff and other institutional investors ... [ARC financial statements audited by defendants were] supplied to Plaintiff, reviewed by it and specifically relied upon in its investment decision. [Complaint ¶ 20].

6. [T]he Defendants ... misrepresented various facts material to plaintiff's investment decision ... to induce Plaintiff's investment purchase of ARC's Promissory Notes. [Complaint ¶ 22].

The plaintiffs' characterization of the transaction in terms of an "offering," an "investment," and an "investment decision" by "institutional investors" adds very little to this court's ability to determine whether the promissory notes are properly considered a "security." These allegations are conclusory and do not provide the facts necessary to establish federal jurisdiction. As was the case in *Canadian Imperial Bank of Commerce Trust Company v. Fingland*, 615 F.2d 465 (7th Cir. 1980), the court is left with the bare words "promissory note" and conclusory allegations regarding the investment purpose of the plaintiff bank.

The defendants, and Arthur Andersen in particular, contend that these allegations cannot suffice to turn what is no more than a commercial bank loan into a securities transaction in order to establish federal jurisdiction. This court agrees.

In *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975), plaintiff alleged that certain *shares* representing a purchaser's interest in a nonprofit cooperative were within the meaning of the term "security" under the Securities Act and the Exchange Act. Similar to the banks' reliance upon the allegation that a "note" was purchased for investment, the plaintiff in *Forman* alleged that the shares were "stock," included in the definition of "security" in both Acts.

The Supreme Court, drawing on the reasoning of *SEC v. W. J. Howey Co.*, 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946), reversed the Court of Appeals and affirmed the district court's dismissal for lack of subject matter jurisdiction. In so doing, the Supreme Court stated:

"We reject at the outset any suggestion that the present transaction, evidenced by the sale of shares called "stock," must be considered a security transaction simply because the statutory definition of a security includes the words "any ... stock." "[I]n searching for the meaning and scope of the word 'security' in the Act[s], form should be disregarded for substance and the emphasis should be on economic reality."

*Id.*, 421 U.S. at 848, 95 S.Ct. at 2058. "In considering these claims, we must again examine the substance—the economic realities of the transaction—rather than the names that may have been employed by the parties.... The touchstone is the presence of an investment in a common venture premised on a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others."

*Id.* at 851–52, 95 S.Ct. at 2060–61.

In this circuit, *Forman* has been construed in a number of cases in which a bank loan, evidenced by a promissory note of the borrower, was invoked as the jurisdictional basis for a claim under the federal securities laws. In *C.N.S. Enterprises, Inc. v. G. & G. Enterprises, Inc.*, 508 F.2d 1354 (7th Cir. 1975), the Court of Appeals held that whether or not a note is a security depends upon whether the note is a "commercial" or "investment" note. In that case the Court affirmed the dismissal of a complaint for lack of subject matter jurisdiction because in the context of the business transaction out of which the claim arose the complaint failed to show that the notes were anything

other than the evidence of an "ordinary commercial loan." The Court stated that:

> [N]othing alleged in the complaint indicated that these two notes represent anything beyond the borrowing of money to make partial payment upon the purchase of the assets of a business.
> Nothing alleged in the complaint indicated in any way that the bank was an investor in the business or a co-partner in the enterprise. The impetus for the transaction appears to have come from the borrowers who needed cash to complete the purchase. There is no allegation that the bank solicited the plaintiffs to interest them in an investment. The business enterprise involved was to be operated by the plaintiffs, not by the bank or by the defendants as an investment for the plaintiffs. The complaint was silent as to any of the factors which conceivably might tend to transform an ordinary commercial loan into an investment security.

508 F.2d at 1362–63.

In *Emisco Industries, Inc. v. Pro's Inc.*, 543 F.2d 38 (7th Cir. 1976), the Seventh Circuit affirmed the dismissal of a complaint for lack of subject matter jurisdiction because the complaint failed to allege facts necessary to conclude that a note given as consideration for a loan to be used to purchase assets of a business represented an "investment in a common venture premised on a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others." *Id.* at 40.

The complaints in these cases make it clear that ARC, the issuer of the notes, "sought" a loan from plaintiffs in order to refinance outstanding indebtedness to another bank and one of its subsidiaries, and to increase its working capital. *See* Complaint ¶ 17.

In determining whether or not jurisdictional allegations relating to the existence of a "security" are sufficient under the commercial-investment dichotomy approach, this court has been educated in the difficulties of applying this test. As Judge Sprecher pointed out in *C.N.S. Enterprises, Inc., supra* at 1359:

> In one sense every lender of money is an investor since he places his money at risk in anticipation of a profit in the form of interest. Also in a broad sense every investor lends his money to a borrower who uses it for a price and is expected to return it one day. On the other hand, the polarized extremes are conceptually identifiable: buying shares of the common stock of a publicly held corporation, where the impetus for the transaction comes from the person with the money, is an investment; borrowing money from a bank to finance the purchase of an automobile, where the impetus for the transaction comes from the person who needs the money is a loan. In between is a gray area which, in the absence of further congressional indication of intent or Supreme Court construction, has been and must be in the future subjected to case-by-case treatment.

These cases fall in that gray area and in this court's opinion support Judge Friendly's observation that "efforts to provide meaningful criteria for decision under the 'commercial-investment' dichotomy do not seem . . . to carry much promise of success." *Exchange National Bank of Chicago v. Touche Ross & Co.*, 544 F.2d 1126, 1136 (2d Cir. 1976).

In approaching the motions to dismiss the court notes that defendant Arthur Andersen emphasizes the deficiency in the factual allegations supporting jurisdiction and the court notes that the Seventh Circuit has applied a much stricter standard of pleading in the context of a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction than it has applied to an attack on a complaint for failure to state a claim upon which relief can be granted. *Compare Fingland, supra* with *Conley v. Gibson*, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

Thus, the burden of pleading specific facts showing that the jurisdictional requirement of a "security" is involved in a case falls on the plaintiff, and given the Seventh Circuit's decisions in this area it

would seem that a great deal of information would be required in order to allege jurisdiction whenever a claim was based on an instrument that falls in the "gray area" between a clearly commercial and clearly investment instrument.

In *Canadian Imperial Bank of Commerce Trust Company v. Fingland*, 615 F.2d 465 (7th Cir. 1980), the Court of Appeals affirmed the dismissal of a complaint for lack of subject matter jurisdiction and held that the following allegations were insufficient to conclude that a certificate of deposit was a security within the meaning of the Exchange Act:

> In fact, through the period indicated, contrary to its representations as to the investments it would make of trust funds, Mercantile Bank from time to time invested trust funds in excess of $500,-000.00 in its own certificates of deposit. On information and belief, plaintiff states that none said [sic] certificates of deposit were guaranteed by International Bank inasmuch as the information conveyed to the beneficiaries about said investments by Mercantile Bank was deliberately inaccurate. Plaintiff believes that there was in excess of a million and a half dollars so invested. Had the beneficiaries known of this they could have appointed an investment committee or removed Mercantile Bank as Trustee.
>
> On or about December, 1976, advisors of the beneficiaries of the Trusts were informed that the Trusts had some three million five hundred thousand dollars not committed to liabilities or other investments. Mercantile Bank further informed the advisors of the beneficiaries that it intended to invest said funds in certificates of deposit in a bank or banks in London, England. Contrary to said representations said funds were invested, without the knowledge of the beneficiaries or any of their advisors, in certificates of deposit of Mercantile Bank. At that time Mercantile Bank knew it would not redeem the certificates of deposit.

*Id.* at 467–468.

The Seventh Circuit noted that the use of "invested" and "investment" in the complaint in that case was conclusory. In conclusion the Court of Appeals stated:

> [O]n this record with this complaint there is no showing of a scheme involving an investment of money in a common enterprise with profits to come from the efforts of others. Nor is there adequate pleading of an investment in a common venture premised on a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others. The complaint simply describes a victim whose currency was being held in a commercial transaction and not a victim-investor aspiring for profits.
>
> \* \* \* \* \* \*
>
> The definitional provision begins with the words "unless the context otherwise requires" and if a victim can adequately plead non-conclusory allegations showing the context, substance, and reality surrounding the sale or purchase of a particular investment, he may well succeed. However, such a pleading would require the great host of additional facts that we have indicated were lacking in the present complaint.

*Id.* at 470.

■ This court agrees with the defendant Arthur Andersen that the complaints do not properly allege the existence of a "security" for purposes of showing federal jurisdiction and that they should therefore be dismissed. The parties have, however, brought to the court's attention, through the submission of additional materials relating to the transaction, enough additional facts for this court to determine that the defect appearing on the face of the complaint goes beyond pleading deficiencies.

The primary thrust of Coopers & Lybrand's and Alexander Grant & Company's jurisdictional attack is that the promissory note is not, in fact, a "security." This approach is also proper under Rule 12(b)(1), Fed.R.Civ.P.

Recent decisions of the Court of Appeals for the Seventh Circuit illustrate the accuracy of the observation that:

[A] motion under Rule 12(b)(1) may be used to attack two different types of defects. The first is the pleader's failure to comply with Rule 8(a)(1), which means the allegations in the complaint are insufficient to show that the federal court has jurisdiction over the subject matter of the complaint. If the complaint does not properly invoke the court's jurisdiction, then the complaint is defective and, unless the deficiency is cured, the motion must be granted regardless of the actual existence of subject matter jurisdiction. The other defect that may be challenged under Rule 12(b)(1) is the court's actual lack of jurisdiction over the subject matter, a defect that may exist despite the formal sufficiency of the allegations in the complaint.

Wright & Miller, Federal Practice and Procedure: Civil § 1350, p. 549.

It appears from the opinions in *C.N.S. Enterprises Inc. v. G & G Enterprises, Inc.*, 508 F.2d 1354, 1362 (7th Cir. 1975), and *Fingland, supra,* that these cases turned on the insufficiency of the jurisdictional facts alleged in the complaint. On the other hand, the opinions in *Emisco Industries, Inc. v. Pro's Inc.*, 543 F.2d 38 (7th Cir. 1976) and *Frederiksen v. Poloway*, 637 F.2d 1147 (7th Cir. 1981), *cert. denied*, 451 U.S. 1017, 101 S.Ct. 3006, 69 L.Ed.2d 389 (1981), make it clear that the motions to dismiss were granted because facts in the record but outside of the complaint showed that the notes at issue were not "securities" for purposes of the federal securities laws.

The promissory notes at issue in this case are attached as Exhibit A to plaintiffs' memoranda in opposition to the motions to dismiss. They are dated September 15, 1977 and provide that ARC will pay to the banks an aggregate amount of $7,500,000. in 30 quarterly installments of "one/thirtieth of the original principal amount" plus interest at the rate of one percent above the Prime Rate, ... during each of the Company's fiscal years following any fiscal year at the end of which the sum of the Company's Consolidated Net Worth ... plus its Consolidated Subordinated Indebtedness is at least Twenty-five Million Dollars ...; three quarters of one percent above the Prime Rate ... during each of the Company's fiscal years following any fiscal year at the end of which the sum of the Company's Consolidated Net Worth plus its Consolidated Subordinated Indebtedness is at least Twenty-five Million Dollars but less than Thirty Million Dollars; and one half of one percent above the Prime Rate ... during each of the Company's fiscal years following any fiscal year at the end of which the sum of the Company's Consolidated Net Worth plus its Consolidated Subordinated Indebtedness is equal to or greater than Thirty Million Dollars. . . .

*"Prime Rate" as used in this Note shall mean the rate of interest charged by the payee named herein on 90-day unsecured loans made to its most substantial and credit-worthy commercial borrowers ...* (emphasis added)

*See also* sections 1.2(b) and 8.2(p) of Note Agreements, Exhibit B to Plaintiff's Memoranda.

The above-quoted language from the notes is strong evidence that the instruments present nothing more than normal commercial loans with interest tied to the prevailing Prime Rate. *See Amfac Mortgage Corp. v. Arizona Mall of Tempe, Inc.*, 583 F.2d 426, 434 (9th Cir. 1978); *United California Bank v. The Financial Corp.*, 557 F.2d 1351, 1359 (9th Cir. 1977) (both applying "risk capital" test of security); *Lincoln National Bank v. Lampe*, Civ. No. 75–2806, slip op. at 10 (N.D.Ill. June 19, 1978) *aff'd* and adopted sub. nom.; *Lincoln National Bank v. Herber*, 604 F.2d 1038, 1042 (7th Cir. 1979).

The plaintiffs argue that the fact that the interest rate fluctuates above the Prime Rate depending on the equity of the Company is indicative of the investment character of the transaction. On the contrary, the fact that the interest rate decreases as assets available for payments on the notes increase indicates the commercial character of the notes. As the risk of default decreases, the interest rate decreases accord-

ingly. This court sees in this provision and in section 5.6 of the contemporaneously executed Note Agreements no indication that plaintiffs "saw themselves as together engaged in a common enterprise which had as its goal ARC's prosperity." Plaintiff's Memorandum of Law in Opposition to Motion of Defendants to Dismiss, p. 15. This provision merely reflects the reduced risks associated with a loan to a more substantial commercial borrower, rather than "an investment in a common venture premised on a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others." *Forman, supra.*

Section 5.6 of the Note Agreements which the plaintiffs claim evidences the investment character of the transaction contains ARC's covenants that "the sum of its Consolidated Net Worth plus its Consolidated Subordinated Indebtedness" will increase in each of the years 1977 through 1982 by a specified amount. The plaintiffs contend that a "variable interest rate tied in with [a] requirement of corporate growth ... [provides' an ostensible 'incentive' for ARC to meet explicit corporate growth guidelines, [demonstrating] ... that plaintiff[s] ... and ARC saw themselves as together engaged in a common enterprise which had as its goal ARC's prosperity." *Id.*

This court does not agree that these provisions evidence the investment character of the transaction. The covenant contained in section 5.6 of the note agreements is tied to another provision in the note agreements making a breach of that covenant an event of default when the breach "continues for more than 30 days after written notice thereof shall have been received by the company from the holder of the notes." Note Agreement § 7.1(d) The notes provide that upon the occurrence of "an Event of Default as defined" in the Note Agreement, the maturity of the note may be accelerated. These provisions along with many other defined "Events of Default," see Note Agreement § 5.1–5.16, seem clearly to be of the kind and character that any bank making a large commercial loan would insist on in order to insure payment of the debt and minimize its risk as a commercial lender.

This court agrees with the argument of defendant Arthur Anderson & Co. that the above-mentioned provisions of the note and note agreements, providing for acceleration of the note upon 30 days notice to ARC in the event that ARC's "equity" fell below the stated amount in section 5.6 of the Note Agreement indicates the commercial character of the transaction:

> "The Bank's insistence upon a myriad of financial 'fail safe' systems [*see* sections 5.1–5.16 of Note Agreement] is the archetype of a commercial loan transaction and the antithesis of a 'common venture premised on a reasonable expectation of profits ...' "

Reply Memorandum of Arthur Anderson & Co. in Support of its Motion to Dismiss, p. 12.

The plaintiffs also argue that the use of the loan proceeds is evidence of the sale of a security. This court again disagrees. Section 5.1 of the Note Agreement limits the use of loan proceeds to the immediate repayment of outstanding debt in the amount of $5,200,000. to Illinois National Bank and Trust Company of Chicago and Guaranty Reinsurance Company Limited, an ARC subsidiary. The remainder of the $7,500,000. was to be applied to the expenses of the loan transaction and was to be used by ARC to supplement its working capital. This court believes that all of these uses of the proceeds of the transaction are consistent with commercial loans made by banks. *Cf. United California Bank v. The Financial Corp.*, 557 F.2d 1351, 1359 (9th Cir. 1977) (loan for working capital); *Great Western Bank & Trust v. Kotz*, 532 F.2d 1252, 1258 (9th Cir. 1976) (loan to maintain financial position).

The plaintiffs have also pointed to references in ARC's financial statements and in a Form 10–K filed with the Securities and Exchange Commission which they maintain shows that ARC considered the notes securities. However, the defendants have pointed to a number of places in the Note Agreement, as supplemented and amended

where the parties to the transaction characterized the transaction in terms of "lender" and "borrower." The court believes that ARC's characterization of the notes in the statements relied on by the banks is, at best, a highly ambiguous indication that ARC considered the transaction a sale of securities.[4]

The court has attempted to focus on the economic realities surrounding the transaction and has been left unpersuaded by the plaintiffs' attempts to characterize notes, seemingly evidencing only a large commercial bank loan, as securities, under the six factor test discussed in *C.N.S. Enterprises, Inv. v. G & G Enterprises, Inc.*, 508 F.2d 1354 (7th Cir. 1975). This court has been persuaded by the arguments of the three defendants that the plaintiffs have failed to show that the notes at issue are anything more than the evidence of a commercial loan to a substantial borrower.

Moreover, the court has been persuaded by the arguments of the defendants and the documentation submitted by the parties, that the economic realities of the transaction indicate that the transaction at issue was a commercial loan. It is clear that the borrower ARC sought the financial assistance of three banks to "roll-over" existing indebtedness and supplement its working capital. The notes provided for a variable interest rate tied to the Prime Rate, i.e., the rate charged the banks' "most substantial and credit-worthy commercial borrowers." The Note Agreements provided a variety of risk reducing provisions and events of default calling for immediate acceleration of the note at the Banks' option, thus minimizing the extent of the Banks' reliance on the efforts of others. Only three notes were involved in the transaction and the total dollar amount of the transaction represented only a fraction of ARC's consolidated liabilities and shareholder's equities. *See* Exhibit D to Plaintiffs' Memoranda. These facts lead the court to agree with defendants that the plaintiffs have failed to dem-

onstrate that these notes are securities under the commercial/investment dichotomy test applied in this circuit and thus, have failed to demonstrate the existence of subject matter jurisdiction over the complaints filed in these cases.

Defendants' motions to dismiss for lack of subject matter jurisdiction are therefore granted.

how the banks treated the transaction on their own books, clearly indicates that the banks treated the transaction as a loan.

---

4. In addition to the extent the parties' characterization of the transaction is relevant, this court has little doubt that the banks' silence in the face of defendants' invitation to indicate